WILLIAM C. KING, SR., AND MARGARET G. KING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
King v. Commissioner
Docket No. 6907-79.
United States Tax Court
T.C. Memo 1982-282; 1982 Tax Ct. Memo LEXIS 466; 43 T.C.M. (CCH) 1441; T.C.M. (RIA) 82282; May 20, 1982. *466 In 1975 petitioners deposited $ 55,500 in cash in a bank account which they used to pay deficiencies and additions to tax determined by respondent to be due for the years 1972-74. In this case respondent determined the $ 55,500 was unreported taxable income in 1975. Held: Petitioners proved that a part of the $ 55,500 cash deposited came from a cash hoard accumulated in prior years. Amount determined. Held, further: Addition to tax for negligence or intentional disregard of rules and regulations not approved. Richard A. Josepher and Marvin C. Gutter, for the petitioners. Theodore F. Brill, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in and addition to tax in petitioners' 1975 Federal income tax in the amounts of $ 23,194 and $ 1,160, respectively. The issues to be decided are (1) whether petitioners had unreported taxable income in the amount of $ 55,500, and (2) whether petitioners are liable for an addition to tax imposed under section 6653 (a) [1] for negligent or intentional disregard of the rules and regulations. [2]
*467 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. Petitioner William C. King and Margaret G. King, husband and wife, resided in Miami, Fla., at the time of filing the petition herein. Petitioner Margaret G. King is a party herein solely by having filed a joint return with William C. King (hereinafter petitioner). Petitioner has been the owner of an electrical business known as King's Electrical Motor Service since 1951. This business consists of the rewinding [3] and repairing of electrical motors, pumps, and generators. Much of the work is performed by hand, although some machines are used. Most of these machines are quite old, having been acquired when petitioner first began the business. Customers of petitioner's business include many of the utility companies and large hotels in the Miami area. A petty cash fund of about $ 25 was maintained at the business although nearly all customers paid by check. *468 Other than interest earned on two small savings accounts, petitioner's only source of income during the taxable year in issue was his electrical business. Petitioner had a reputation as one of the best motor rewinders in the Miami area. In 1975, the taxable year in issue, petitioner's income tax returns for the taxable years 1972 through 1974 were audited by the Internal Revenue Service. As a result of this audit, deficiencies in and additions to tax under section 6653(a)(1) were determined. Thereafter petitioner agreed to pay the Internal Revenue Service $ 53,700.80 in satisfaction of the determined deficiencies in and additions to tax. Petitioner opened a joint checking account at the Central National Bank of Miami with a deposit of $ 55,500 on December 4, 1975, to effect this payment. He wanted to pay by check rather than by cash so that he would have a record of the payment in the way of cancelled checks. On December 4, 1975, petitioner wrote three checks from this account, all payable to the Internal Revenue Service, in the amounts of $ 21,744.85, $ 7,267.73, and $ 24,688.22. The bulk of the deficiencies determined for such years was due to adjustments made in the *469 costs of goods sold for petitioner's electrical business. Petitioner had personally maintained and prepared the books and records for his business. His method of bookkeeping was imprecise, due in large part to his practice of making out checks either to cash or to himself for both the purchase of materials needed for his business and his personal use. [4] Consequently, petitioner was unable to substantiate large amounts that he claimed had been expended for materials. To avoid any further income tax problems caused by poor bookkeeping in 1975, petitioner hired a certified public accountant (hereinafter CPA) to straighten out his books and to establish a system of proper recordkeeping. The changes made included, among others, the cessation of writing checks to himself or to cash when purchasing business materials, and the opening of charge accounts with his suppliers. The CPA determined the gross receipts for the taxable year in issue, as indicated on petitioner's Schedule C, from the State sales tax figures, since the books and records from the business were still in the process of being reconstructed. Petitioner's 1975 income *470 tax return was audited in 1977. The auditing agent used an indirect method known as the bank deposits method to determine the gross receipts from petitioner's business. In applying this method, the agent totaled the bank deposits made in connection with petitioner's business, taking into account any bank redeposits or transfers and insurance premium refunds. The gross receipts amount determined by the agent was approximately equal to the amount reported on petitioner's tax return, with the exception of the $ 55,500 deposited into the Central National Bank of Miami on December 4, 1975, which was used to pay off the tax deficiency owed for prior years. The dispute herein centers on the source of that bank deposit. 1. Accumulated amounts.
Petitioner stated that the $ 55,500 included approximately $ 40,500 which had been accumulated over the years during his two marriages and stored in one of two safes, [5] including $ 1,500 to $ 2,000 which had been accumulated during 1975. *471 Petitioner was married in 1936 to Frances King (hereinafter Frances). They remained married for more than 25 years during which time they acquired two houses, one in 1943 and and one in 1960, respectively. Both were rather plain, inexpensive homes, and neither were furnished extravagantly. Petitioner was divorced from Frances in 1962. In 1963, he married his present wife, Margaret G. King (hereinafter Rita). Throughout both of his marriages, petitioner maintained a frugal lifestyle, although he always adequately provided for the needs of his family. Because of such lifestyle, petitioner was able to save much of the money earned over the years from his electrical business. He did not deposit the majority of these savings in savings institutions. Instead, they were kept in a safe maintained at each of his respective homes. Petitioner also kept some of his savings in his top dresser drawer. Rita stated that it was petitioner's "habit" to keep the money saved around the house so that it would be easily accessible. Petitioner, did, however, maintain a business checking account, a joint checking account with Rita, and an individual retirement account during the taxable year *472 in issue. [6]
Petitioner acquired his first safe in 1948, during his marriage to Frances. It was approximately 2 feet long and 18 inches wide, with a door and combination lock located in the front. Both petitioner and Frances knew the combination to the safe. As petitioner's savings accumulated, they initially were placed in the bottom part of the safe. The money located at the bottom part of the safe was usually made up of small denominations such a $ 5 or $ 10 bills and was bound by rubber bands. This money was used to purchase household needs such as groceries, or for small emergencies. As the amount of cash accumulated beyond these needs, petitioner converted it into larger denominations of $ 20 to $ 100 bills. These amounts were then placed into envelopes and deposited in the top portion of the safe. The amount of money in the safe grew throughout petitioner's marriage *473 to Frances. Frances opened the safe no more than 20 times during their marriage and never withdrew more than $ 300 at any one time. Although she had never had an occasion to count the money, she estimated that in 1962 "there could easily have been $ 10,000" in the safe. [7]
Since the time of petitioner's marriage to Rita, and including the taxable year in issue, he continued to save in the same mode and manner as he had during his first marriage. In 1964, petitioner acquired a new safe, which he installed in the floor of the utility room in his house. This safe was round, stood about 2 feet tall, and approximately 8 to 10 inches in diameter, and had a door on the top of it with a combination lock. As with petitioner's first safe, the money in this safe was kept in envelopes, and was bound by rubber-bands. From the time of their marriage in 1963 until and including the taxable year in issue, Rita opened the safe only about five times, the last time being in 1972 or 1973. The safe was difficult *474 for her to get to because it was located in the floor near a furnace, and she had to lie on her stomach in order to get to it. Rita often saw petitioner put money into the envelopes which were put into the safe. Although she could not estimate how much money was in the safe during 1975, she believed there was a substantial sum due to "the thickness of the envelopes." She stated there were about 8 to 10 envelopes the last time she opened the safe, in 1972 or 1973. Throughout their marriage, and including the taxable year in issue, petitioner kept approximately $ 200 to $ 300 in his top dresser drawer. Rita never counted the amount located in the drawer, but often took between $ 20 and $ 30 to pay for family needs. 2. Loan Proceeds.
Petitioner stated that $ 15,000 of the $ 55,500 bank deposit consisted of gifts and loans from family, friends, and business acquaintances.Petitioner stated that "carnival people" for whom he had done a great deal of electrical work over the years had "passed the hat" and collected approximately $ 7,500. Petitioner, however, refused to disclose the names of the carnival people who contributed, stating that he had promised he would not do so. *475 During the audit of his 1975 tax return, petitioner refused to disclose the identity of any persons making gifts or loans. Petitioner did, however, testify at trial that the following individuals gave or loaned him the amounts indicated: [8] Frances King, [9] $ 500; John King (brother), $ 500; John Hughs (employee), $ 500 to $ 600; C. B. Ross (employee), $ 450 to $ 500; and Hugh Smith (friend), $ 500 to $ 600. Rita stated that during 1975 petitioner had been concerned about his tax problems, and that he had made several phone calls to friends and acquaintances to raise money to pay off the tax deficiency. Just before petitioner paid the Internal Revenue Service, Rita saw him counting the money which had been in the safe. Petitioner laid the money out on their bed and sorted the bills by denomination. Next to the bed was a small trash can into which petitioner discarded the envelopes and small white cards after removing the *476 money. Rita remained in the room only a short time so as not to disturb petitioner. She later saw him leave the house with a small briefcase or airline bag [10] containing the money. The next day petitioner informed Rita that he had paid the taxes owed to the Internal Revenue Service. On his tax return for the taxable year 1975, petitioner reported taxable income of $ 6,394.82. In his notice of deficiency, respondent determined that the $ 55,500 deposited by petitioner on December 4, 1975, constituted unreported taxable income and adjusted his taxable income and tax laibility accordingly. OPINION The first issue is whether for the taxable year 1975 petitioner had unreported taxable income of $ 55,500. Petitioner maintains the $ 55,500 bank deposit was not unreported taxable income. He claims that for over 25 years he had kept nearly all his savings in safes maintained at his two respective homes, that he had always lived in a frugal manner, and that *477 his only source of income was his electrical business. Moreover, he claims that the manner of receiving loans from carnival people was reasonable in view of the many years of service petitioner had given them and their desire not to become involved with the Internal Revenue Service. Respondent maintains that petitioner has not offered any reasonable explanation for the cash hoard, and that the testimony as to petitioner's custom of keeping cash in safes at his home is improbable, unreasonable, and questionable since he maintained several bank accounts. Further, he claims that the testimony regarding loans from carnival people should be given no weight since petitioner refused to give their names and no corroborative evidence was submitted. The bank deposit method has been accepted as a proper means for reconstructing income. See Estate of Mary Mason v. Commissioner,64 T.C. 651 (1975), affd. 566 F.2d 2 (6th Cir. 1977). [11] Once the amount of a bank deposit is included in income by respondent, the burden is on the taxpayer to overcome the presumptive correctness of that action. Nicholas v. Commissioner,70 T.C. 1057, 1064 (1978). *478 We note at the outset that respondent does not claim that the $ 55,500 bank deposit was additional, unreported gross receipts from petitioner's electrical business or from any other specific taxable income source. Simply stated, respondent has not found petitioner's explanation that the source of the bank deposit was cash accumulations and gifts and loans to be believable, and therefore claims that it must be unreported taxable income. With regard to the $ 40,500 claimed to have been accumulated, we find the testimony of petitioner, Frances, and Rita to be persuasive. True, petitioner maintained savings accounts during the taxable year in issue and in prior years which, without more, might cast doubt on his claim of having saved his earnings at home. However, the evidence presented clearly establishes that throughout both his marriages, petitioner habitually saved the bulk of his earnings in a safe at home, and that the total amount of those savings grew continuously since at least 1948 when he acquired his first safe. [12]
*479 The evidence presented establishes that petitioner always maintained a modest lifestyle and was frugal with his money, both in his business and at home. Further, although neither Frances nor Rita ever had occasion to count the funds kept in either of petitioner's safes, both witnessed petitioner depositing the money into such safes and saw the money and envelopes containing money located therein. Rita stated that just prior to the time petitioner paid off the tax deficiency owed to the Internal Revenue Service in 1975, she saw petitioner counting the money from the safe. Although her eyesight was not good, we found her to be an honest and forthright witness. After viewing the demeanor of the witnesses, hearing their testimony, and reviewing the record, we do not find the testimony given to be either improbable, unreasonable, or questionable. Cf. Archer v. Commissioner,227 F.2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this Court. In short, for the most part, we believe the witness.
In view of the foregoing, we are convinced that petitioner did have a large sum of accumulated savings during the taxable year in issue which constituted income earned *480 in prior years, and that this in part was the sum that was deposited in the bank to help pay off the tax deficiency owed from prior years. [13] Unfortunatley, petitioner could only estimate that at the beginning of 1975 he had accumulated approximately $ 40,500, and that during 1975 he accumulated "not more than" $ 1,500 to $ 2,000. He stated that "as near as he could remember" the white card on which he had kept records of the amount accumulated, and which indicated the amount accumulated as of "11-26-75" to be $ 40,500, was accurate. Even though we cannot determine with certainty the amount accumulated, using our best judgment, we find that $ 37,500 of the amount deposited in the Central National Bank of Miami constituted accumulated savings from prior years and is therefore not taxable income to petitioner in 1975. See Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930); Rogers v. Commissioner,248 F.2d 452 (7th Cir. 1957), affg. a Memorandum Opinion of this Court. *481 With regard to the portion of the bank deposit which petitioner claims to have received in part as gifts and in part as loans, we find that only with respect to $ 500 has petitioner met his burden of proof. Unlike the evidence presented concerning the accumulated income, petitioner has come forth with no corroborating evidence as to the amounts he received from the carnival people and has consistently refused to disclose the names of such persons who contributed. While we respect petitioner's personal obligation to keep his promise of not disclosing the names of the people who gave him money, the burden of proof on this issue remains with petitioner. Petitioner testified as to the identity and approximate amount loaned to him by friends and business acquaintances. However, none of those individuals, with the exception of Frances, were called as witnesses to corroborate petitioner's claim. We also note that during the audit of his 1975 tax return petitioner refused to disclose to respondent any names of those making gifts or loans. True, Rita did state that petitioner made a number of phone calls to family, friends, and business acquaintances to raise money to pay the tax deficiency *482 owed for prior years, and we have no reason to to doubt her testimony. As to whether or not he was successful in this endeavor, however, the only evidence presented was petitioner's generally uncorroborated testimony. Based on the evidence presented, we find that $ 500 of the amount deposited in the Central National Bank of Miami constituted either gifts or loans received by petitioner and therefore is not taxable income. The next issue is whether petitioner is liable for an addition to tax under section 6653(a)(1) for negligent or intentional disregard of the rules and regulations. The burden of proof on the issue is on petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure; Gilman v. Commissioner,72 T.C. 730, 751 (1979). We think petitioner has met that burden. The deficiency determined herein was the result, in respondent's view, of petitioner's failure to substantiate his claim that the bank deposit in question was not unreported taxable income. For the most part we have found that the bank deposit did indeed constitute nontaxable income in the taxable year 1975. With respect to a large part of the remainder of the bank deposit, petitioner *483 failed to carry his burden of proving that it was not unreported taxable income because of his refusal to present corroborative evidence as to the claimed source of these funds. While this has led us to find that it was unreported taxable income, we do not believe that this alone means that petitioner negligently or intentionally disregarded the rules and regulations in failing to include such funds in income. [14] In 1975 petitioner employed a certified public accountant to straighten out his books and to establish a system of proper recordkeeping.Unfortunately the books and records had not been sufficiently reconstructed by the time the 1975 return was due to use such books and records in computing petitioner's 1975 taxable income. Nevertheless, we think this indicates an effort by petitioner to comply with the rules and regulations rather than to negligently or intentionally disregard them. Considering all the evidence and circumstances, we conclude that petitioner has shown that no part of the underpayment for 1975 was due to negligence or intentional disregard of the rules and regulations. We hold for petitioner on this issue. *484 Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year 1975. ↩
2. In his petition, petitioner claimed attorney's fees. However, we do not have jurisdiction to award attorney's fees, McQuiston v. Commissioner, 78 T.C.     (May 13, 1982), KeyBuick Co. V. Commissioner,68 T.C. 178 (1977), affd. 613 F.2d 1306↩ (5th Cir. 1980), and therefore do not consider petitioner's claim.
3. Rewinding a motor entails removing burned coils, installing new coils and insulation, coating the coils with a certain solution, baking the coils, and then assembling the motor with new bearings.↩
4. Petitioner did not pay himself a salary.↩
5. Petitioner kept track of the amounts he had accumulated in his safes by indicating on small white cards maintained with the money. One of these white cards indicated that as of "11-26-75," $ 40,500 was contained in the safe.↩
6. Between 1962 and 1975, petitioner had maintained one savings account in trust for his daughter, two separate savings accounts with his mother and one joint savings account with his sister. By 1975, however, these accounts had been closed. Prior to 1962, petitioner did not have a savings account.↩
7. Frances had worked 16 years as a cashier and then office manager for the Dade County Schools Employee Credit Union, in which job she handled or supervised large amounts of currency.↩
8. Petitioner testified that the loans were interest free and were to be paid back whenever petitioner could afford it. ↩
9. Frances stated that she had loaned petitioner $ 500 in 1975 to help pay off the tax deficiency. This amount was repaid in 1976.↩
10. Rita had a history of serious eye trouble, and in 1973, her left eye was operated on for Glaucoma. Because of her poor eyesight, Rita could not distinguish whether the container was a briefcase or an airline bag.↩
11. See Gersten v. Commissioner,T.C. Memo. 1980-487↩.
12. There is evidence that petitioner customarily over the years cashed business checks and drew checks to cash with which he paid both business and personal expenses, and that any cash left over was taken home.↩
13. Respondent made no adjustments to petitioners' return for 1975 except adding the $ 55,500 deposit to gross income. If this was gross receipts of the business, it would throw the percentage of cost of goods sold to gross receipts considerably out of line with the percentages in prior years. Respondent has shown no other possible source of the additional income. Petitioner suggests that a possible source of the money in the safe was the excess of unsubstantiated claims for cost of goods sold which respondent disallowed to determine the deficiencies for 1972-74, which petitioner has now paid.↩
14. On brief, respondent stated his position to be that petitioners were negligent in failing to keep adequate and complete records of unreported↩ income for the taxable year in question. The only item in dispute is the $ 55,500 cash deposit. Apparently, respondent was able to substantiate all the figures reported by petitioner on his 1975 return.